This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Donna Heatherly, appeals from a judgment of the Court of Common Pleas, Juvenile Division, denying her motion for legal custody or a six-month extension of temporary custody, terminating her parental rights, and placing her son, Richard Heatherly, in the permanent custody of Summit County Children Services Board. We affirm.
 I.
Summit County Children Services Board ("CSB") filed a sworn complaint on October 2, 2000, alleging that Richard Heatherly ("Ricky"), born June 19, 1988, was abused, neglected and dependent, and sought emergency temporary custody of the child. His two siblings, Lacy Urdiales, born February 26, 1992, and Charles Heatherly, born August 2, 1984, were also removed from the home at the same time. The siblings are not parties to this appeal. Appellant was the sole custodian of Ricky as his biological father was deceased.
The complaint was filed by CSB because of allegations that the child was a victim of sexual abuse by Donald Neff, an acquaintance of the Heatherly family.[1] At that time, the child also reported that Appellant had sexually abused him. The juvenile court granted the emergency order and set the case for a shelter care hearing. Following the shelter care hearing, custody was continued in CSB and no visitation was permitted. Counsel was appointed for Appellant and an attorney/guardian ad litem was appointed for the child.
Appellant moved the court for an order permitting visitation. CSB opposed the motion because of allegations that the mother had sexually abused Ricky, indications from the child that he did not wish to visit with his mother, and statements by the counselor that visitation with the mother would not be in the child's best interest at that time. The court ordered that the motion be held in abeyance pending disposition.
The matter was set for an adjudicatory hearing, at which time the parties stipulated that Ricky was abused and dependent and that Charles and Lacy were dependent. Following the dispositional hearing, the parties agreed that all three children should be placed in the temporary custody of CSB. Charles and Lacy were placed in the care of John Urdiales, Sr., Lacy's biological father, and Ricky was placed in a foster home. Appellant was granted visitation with Charles and Lacy, but agreed that her request for visitation with Ricky should be held in abeyance.
The juvenile court adopted the case plan as amended. Appellant's obligations under the case plan included completion of a drug and alcohol assessment, participation in substance abuse counseling, submitting to random drug tests, participation in parenting counseling, and maintenance of clean, safe and stable housing with functioning utilities. Ricky was to receive a psychological and/or psychiatric evaluation and address his emotional/behavioral issues in a therapeutic setting, including individual and group therapy and medication. Appellant's paramour, Norman Barber, was also added to the case plan.
Periodic review hearings were held. Ultimately, on July 20, 2001, CSB filed a motion for the permanent custody of Ricky Heatherly and the matter was set for an evidentiary hearing. Proceedings as to the two siblings continued separately. Following a four-day hearing, the juvenile court denied Appellant's motion for legal custody or a six-month extension of temporary custody, terminated the parental rights of Appellant, and granted CSB's motion for permanent custody. This appeal followed. Appellant has assigned two errors for review.
 II. Assignment of Error I "The trial court findings were against the manifest weight of the evidence when it held that Appellant Heatherly's child could not be placed in Appellant's custody within a reasonable amount of time under R.C. 2151.414(E)."
Through her first assignment of error Appellant asserts that the weight of the evidence does not support the finding of the trial court that the child could not be placed in her custody within a reasonable amount of time.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175; see, also, State v.Otten (1986), 33 Ohio App.3d 339, 340.
Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19, citing Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment."Karches, 38 Ohio St.3d at 19. Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
Before a public children services agency may be granted permanent custody of a child that has not been abandoned, orphaned, or in temporary custody for twelve months, a juvenile court must find: (1) that it is in the child's best interest and (2) that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. R.C. 2151.414(B)(1). Appellant, in the present case, challenges the latter finding.
In determining whether a child can or should be placed with a parent within a reasonable time, the court is to consider "all relevant evidence." R.C. 2151.414(E). In addition, R.C. 2151.414(E) contains several enumerated factors, the presence of any one of which requires the court, upon a finding by clear and convincing evidence that the factor is present or occurred in the case, to enter a finding that the child cannot or should not be placed with a parent within a reasonable time.
Appellant has framed much of her argument as a rebuttal to the statutory factors listed in R.C. 2151.414(E)(1) — (4), (8), and (9). The juvenile court relied only upon R.C. 2151.414(E)(1). Therefore, arguments in regard to the remaining factors do not demonstrate error and it is not necessary for this court to address them.
In this case, the juvenile court found that Appellant failed to substantially remedy the problems that existed when the child was removed. See R.C. 2151.414(E)(1). This determination, if supported, compels the conclusion that the child cannot be placed with his parent within a reasonable time or should not be placed with his parent. See R.C. 2151.414(E). Thus, on review, we consider the evidence that was before the juvenile court that is relevant to the finding that Appellant failed to substantially remedy the problems that existed when the child was removed from the home.
R.C.2151.4114(E)(1) provides, in pertinent part, as follows:
 "Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."
In determining whether the parents have substantially remedied those conditions, the court "shall consider parental utilization of medical psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties." Id.
In regard to this point, Appellant argues that the weight of the evidence supports a finding that she complied with her case plan "to the best of her abilities." Such an argument does not carry the day when two caseworkers testified that her compliance with the case plan was minimal and had, in fact, deteriorated over time, that she tested positive for marijuana on two occasions just prior to the hearing in this matter, that she had been sporadic in attending counseling sessions, that she is either unemployed or minimally employed, and does not have stable housing as she is living with the parents of her current boyfriend, who is also unemployed.
Nevertheless, the question before this court is not simply whether Appellant has complied with her case plan. This court has previously indicated that even where there has been substantial compliance with a case plan, that, in and of itself, does not prove that a grant of permanent custody to an agency is erroneous. In re Watkins v. Harris
(Aug. 30, 1995), 9th Dist. No. 17068, at 9. The dispositive issue, relevant to R.C. 2151.414(E)(1), is not whether the parent has substantially complied with the case plan; rather, it is whether the parent has substantially remedied the conditions that caused the child's removal from the home. See, e.g., In re McKenzie (Oct. 18, 1995), 9th Dist. No. 95CA0015, at 7-8. In that regard, we find that the great weight of the evidence on this point supports the finding of the juvenile court.
Appellant testified in her own behalf. She testified that she was divorced from Ricky's father before he committed suicide, but that the boys were close to him and his death required a difficult adjustment. She stated that she first met Neff through mutual friends. He would casually drop in for coffee or to play cards. He would often show up wearing a Boy Scout uniform and eventually arranged for both of her sons to join the scouts. As a single parent, she appreciated his help with the children. Eventually Neff would spend more time with Ricky, taking him places and getting him gifts. Ricky became very attached to Neff and even started called him "Dad" against Appellant's wishes. Appellant somewhat restricted Neff's access to Ricky after he "showed her up" with his gift-giving. According to Appellant, Neff felt threatened when her new boyfriend, Norman Barber, moved in with her. Appellant believed Ricky must have been "brainwashed" by Neff into believing falsehoods about her, including that she physically and sexually abused him.
Over Labor Day weekend, Appellant allowed Neff to take all three of her children on a camping trip while she went on a weekend trip to West Virginia to visit her mother. At about the same time, Neff loaned Appellant $2500 to pay off a credit card debt. She claims she had no suspicions about Neff harming Ricky at that point. It was not until after the camping trip, she claims, that she learned from the police that Neff might be molesting the boys. However, her older son, Charles, testified that Appellant knew of the accusations that Neff had done something improper to both Ricky and another neighborhood boy before allowing himself, Lacy, and Ricky to go camping that weekend. Ricky's guardian ad litem also reported his belief that Appellant was aware that Neff was being investigated for sexual abuse before allowing her children to go camping with him.
Appellant claims she "hid" Ricky the next weekend to keep him safe by having him stay with a friend, but failed to tell the friend that Ricky was being "hidden," why, or from whom. Neff, therefore, apparently determined Ricky's whereabouts and contacted him by phone. The following Wednesday, Ricky left school with Neff and was gone for several days, resulting in criminal charges against Neff, child endangering charges against Appellant, and removal of Ricky and his siblings from their home.
Appellant also presented testimony from Wanda Hively, who counseled Appellant for five months in 1998, four months in 1999, three months in 2000, and again in October of 2001. Hively stated that the counseling was terminated each time by Appellant. At the time of the early sessions, Appellant had been in a physically abusive relationship with Ricky's father and Hively attempted to address Appellant's need to make better decisions in that regard. On another occasion, she was in an emotionally abusive relationship. Appellant testified that she was in that relationship for five years. The man also drank a lot, used bad language, and offered beer to Ricky on a camping trip, according to Appellant.
Hively did testify that she believed Appellant was able to parent Ricky, but she had never met Ricky and was not aware, until these proceedings, of how strongly he felt about not returning to his mother. Under those conditions, Hively stated that she believed Ricky should not be forced to return at the present time. He would need more individual and perhaps joint counseling with Appellant before visitation should be attempted, let alone custody. Hively admitted that by failing to maintain consistent counseling, under the circumstances of the court order in these proceedings, Appellant had exercised "poor judgment." She also concedes that Appellant's abusive relationships had had a negative effect on her children.
Jack Hrinak also testified as a witness for Appellant. He counseled Ricky at the Child Guidance Center from October 1998 until the spring of 2000. Ricky had been diagnosed with moderate conduct disorder and ADHD, attention deficit hyperactivity disorder. He had problems with depression, dealing with the suicide of his father, impulsivity, lack of control, and poor decision-making. Ricky's problems included making threats of harm to himself, fighting at school, lying, smoking, auditory hallucinations, a need for a positive male role model, and problems with anger control.
Hrinak testified that Appellant was a very supportive parent and was very concerned with her son. But at the same time, Hrinak stated that Appellant had returned to a previous relationship that was abusive, despite her counselor's advice regarding good choices. The counselor stated that the abusive relationship between Appellant and her boyfriend and poor choices by Appellant could definitely have led to some of Ricky's emotional outbursts. Such relationships also give a child a very misguided perception of what a relationship should be and provide a tendency for him to be abusive himself. Hrinak said that the counseling of Ricky stopped because Appellant stopped bringing him.
Christina Young, a friend and neighbor of Appellant, also testified on behalf of Appellant. She testified that Ricky did not have a good concept of right and wrong and that Appellant and Ricky had a "really close connection" and no problems. On cross-examination, Young revealed that she was aware of Appellant's marijuana use, but claimed it was not hurting the children. She also said that she might let her own daughter go on a camping trip with a man who CSB was investigating for sexual abuse, as long as there were other children around.
Cynthia O'Connor of Pastoral Counseling was called as a witness by CSB. After Ricky was placed in the temporary custody of CSB, he began extensive counseling with O'Connor. By the time of the hearing in this matter, O'Connor had counseled Ricky for approximately a year. O'Connor testified that Appellant had refused to consent to Ricky's earlier requests to permit him to counsel with her. Appellant claimed that she did so because Ricky had a guidance counselor and a counselor at Child Guidance. Hrinak testified, however, that his counseling of Ricky was terminated by Appellant in the spring of 2000.
When O'Connor began counseling Ricky, she found him to be very fragile emotionally, that he had many disruptive behaviors, and lacked trust in adults and life in general. At that time, Ricky had a very strong anger and hatred for his mother. He reported physical abuse, put-downs, and feeling worthless. O'Connor opined that Ricky's home environment made him very vulnerable to the sexual abuse of the perpetrator and, without that life experience, he probably would not have been so tolerant of it and willing to engage in it. O'Connor's efforts were focused largely on his adjustment and in helping him avoid unsafe choices. She stated that the underlying issue was that Ricky felt Neff was a safer relationship and easier to be with than his mother.
O'Connor explained that Ricky had an emotional attachment to Neff and trusted him, though irrationally, because he developed a relationship with him. Neff provided friendship and took him to batting cages and on camping trips. O'Connor explained that children who are being sexually abused often develop an intense emotional and mental connection with their abusers. They fall prey to "brainwashing." Ricky believed in Neff as a man who cared about him and that the things he was doing were the best for him.
Sibling visits were attempted, but Ricky's behavior started to deteriorate and regress following those sessions. He became disruptive, lost levels at school, began lying, and oppositional behaviors started. A caseworker described the visits as "tense." O'Connor opined that this negative reaction occurred because of the difficulty in facing the abuse that had occurred and fear that the visits might mean reunification, to which he was opposed. The visits made him feel vulnerable again.
O'Connor did not recommend visitation with Appellant because she felt that it would not be therapeutically sound. Ricky, himself, did not wish to have visitation with his mother and expressed his view in very strong terms. Ricky indicated that, if given a choice, he would choose homelessness over seeing his mother; he would choose death over being with his mother. O'Connor explained that Ricky's view is important on this point because his emotional and mental state matter and the idea of seeing his mother had a strong impact. He had a very negative view of himself before, but sees himself differently now. Even after a year of therapy, Ricky has a lot of anger and maintains that Appellant is responsible for what he experienced with Neff and has great animosity towards her for his life before Neff. Accordingly, O'Connor stated that she did not believe it to be safe or therapeutic to have visits with Appellant within the next six months or even a year.
O'Connor reported that Ricky is presently doing "exceptionally well" at his new school, exhibiting "very good behaviors," and exhibiting "very positive growth" in his foster home. He has continued to maintain however, that he does not want to return to Appellant's custody, and that he wants to remain with his foster family.
O'Connor stated that Ricky desires closure with his mother, that is, termination of her custody. O'Connor also believes this to be appropriate. She does not believe that Appellant has the parenting skills needed or the ability to provide a safe environment for Ricky to move forward. She stated that Ricky needs to break down the barriers he has built to discussing these issues and deal with them. In order to accomplish that, he needs a very supportive, loving, stable household with boundaries and limits for behaviors and appropriate consequences because his behavior will be unpredictable. The family needs to accept him as he is and not blame him for everything that has happened. Ricky sees his foster home as a safe, happy, loving place with rules he can accept. In his mother's home, however, he felt hated, and believed that sex, smoking marijuana, and money were more important than him.
Both caseworkers involved in this case supported placing the child in the permanent custody of CSB. They each stated that Appellant's compliance with the case plan was very poor and had, in fact, gotten worse over time. Caseworker Richard Snyder stated that Appellant's life was not stable enough as of July 2001 to support returning the child to her custody. He also stated that Ricky had experienced an extensive change in his attitude, behavior, outlook on life, and willingness to take responsibility for things over the course of the last year. Caseworker Katherine Predieri testified that she also believed it would be best for Ricky to be placed in the permanent custody of CSB. Appellant had had sufficient time to comply with the case plan and Ricky's mental health concerns and ongoing behavior issues require the type of consistency that he has been receiving from his foster family.
Ricky's guardian ad litem also supported placing him in the permanent custody of CSB. He stated his belief that Ricky is in desparate need of stability and that cannot be achieved without placing him in the permanent custody of CSB. He was also concerned that Appellant had failed to complete the key objectives on her case plan and had demonstrated poor decision-making and poor choices in regard to the plan.
Ricky has retracted a previous claim of sexual abuse by a neighbor and has vacillated on claims of sexual abuse by his mother. Appellant's attorney also suggested an example of a situation where Ricky perceived an event between him and another student differently from the way a teacher perceived it. Appellant's position is that these changes of position and differences in perception indicate an unreliability as to all of Ricky's claims.
Ricky's problems during the time he was in Appellant's care, however, are multi-faceted and do not rest on such narrow grounds. The totality of the events that have occurred and the overall relationship between Appellant and this child cannot be erased by a few recanted statements or the fact that he had a disagreement with a teacher in school. Appellant has a history of making poor decisions and many of those decisions have negatively impacted her children. The record fails to demonstrate that she has a commitment to correcting the problems of the past that would be necessary to permit Ricky to be returned to her care within a reasonable time.
While Appellant contends that many of her present problems and inabilities to comply with the case plan have been circuitously caused and resulted from the stress of the removal of her children and the related time and money constraints necessitated by court proceedings, that does not resolve the matter. The ultimate question facing this court is the best interest of the child and, within that context, whether the child can be safely returned to the custody of his or her parent within a reasonable time. The overwhelming evidence before the court was that that could not be accomplished.
Accordingly, this court cannot conclude that the trier of fact clearly lost its way and created a manifest miscarriage of justice. Appellant's first assignment of error is overruled.
 Assignment of Error II "The trial court abused its discretion in denying Appellant Heatherly's Motions for Legal Custody or a Six-Month Extension and improperly found that the child could not be placed within Appellant Heatherly's custody in a reasonable amount of time."
Through this assignment of error, Appellant contends that the juvenile court abused its discretion in denying her motion for legal custody and her motion for a six-month extension of temporary custody. The basis for her contention is that the juvenile court erred in finding that the child could not be placed in her custody in a reasonable period of time. The same point was considered in Appellant's first assignment of error and the argument was found to be without merit.
Furthermore, in addition to finding that the child could not be placed with a parent within a reasonable period of time, the juvenile court also found that it was in the best interest of the child that Appellant's parental rights should be terminated and that the child should be placed in the permanent custody of CSB. Encompassed within the latter finding is a consideration of the child's need for a legally secure permanent placement. See R.C. 2151.414(D)(4). The juvenile court determined that the child needs and deserves a legally secure placement and that such may not be obtained without a grant of permanent custody to CSB. This unchallenged finding necessarily requires a denial of the motion for legal custody to Appellant as well as a denial of Appellant's motion for a six-month extension of temporary custody. Appellant's second assignment of error is overruled.
 III.
Finding no merit in either of Appellant's two assignments of error, the judgment of the juvenile court is affirmed.
WHITMORE, J., BATCHELDER, J. CONCUR.
[1] As a result of these allegations, Donald Neff entered a plea of guilty to one count of kidnapping and two counts of rape on January 17, 2001. He was also determined to be a sexual predator subject to the requirements of community notification. In addition, Appellant was charged with child endangering and entered a plea of guilty to obstructing justice. She was given a one-year suspended sentence.